IN THE COURT OF APPEALS OF OHIO
FOURTH APPELLATE DISTRICT
SCIOTO COUNTY


IN THE MATTER OF THE : CASE NO. 12CA3509
GUARDIANSHIP OF SUSAN
MAYNARD. :

: DECISION AND JUDGMENT ENTRY

:

_____

APPEARANCES:

COUNSEL FOR APPELLANT: Shane A. Tieman, 707 Sixth Street, P.O. Box 1365,
Portsmouth, Ohio 45662

COUNSEL FOR APPELLEE: Stephen K. Bennett, 960 Tipton Lane, Stout, Ohio 45684
for Appellee Loretta Thomas, Guardian.[1]

_____

CIVIL APPEAL FROM COMMON PLEAS COURT, PROBATE DIVISION
DATE JOURNALIZED: 6-12-13
ABELE, J.:

{¶ 1}   This is an appeal from a Scioto County Common Pleas Court, Probate Division,

judgment that found by clear and convincing evidence that Susan Maynard, appellant herein, is

incompetent, that a guardianship is necessary, and that a guardianship is the least restrictive

means to protect her.

{¶ 2}   Appellant was admitted to Southern Ohio Medical Center (SOMC) on March 23,

2011, after family members revealed that she suffered from severe and debilitating mental and

physical issues.   On that date, appellant and her husband were living in a van.   Appellant's

_____

[1]Loretta Thomas did not enter an appearance in this appeal.

sister, Loretta Thomas (appellee), contacted an emergency medical squad. Appellant initially refused treatment, but after questions from squad members, was transported to SOMC. SOMC records reveal that on admission, appellant was diagnosed with methicillin resistant staphylococcus aureus, renal failure, sepsis, diabetes, and gangrenous toes.

{¶ 3} On April 4, 2011, appellee filed an Application for the Appointment of Emergency Guardian. The court granted the application. On April 5, 2011, appellee filed an Application for Appointment of Guardian of Alleged Incompetent and requested to be appointed guardian of appellant's person.

{¶ 4} On May 3, 2011, appellant was discharged from SOMC and admitted to Concord Healthcare and Rehabilitation Center (Concord). On June 17, 2011, the Scioto County Probate Court Investigator filed a report concerning appellant's proposed continued guardianship. At the June 20, 2011 guardianship hearing, all parties agreed that it would be in appellant's best interest to continue the hearing for two months to allow appellant to leave Concord and to establish herself in an apartment.

{¶ 5} Appellant continued to reside at Concord for continued wound care management of her lower extremities. The established goal was for appellant to continue with therapy and rehabilitation and to return to independent living. Appellant's husband also established himself in an apartment not far from Concord. At Concord, Appellant progressed in therapy as to her ability to walk and to use her hands.

{¶ 6} At the October 6, 2011 guardianship hearing, both appellant and appellee testified. Appellee testified that her son found appellant in such bad condition that he did not think she would live through the night. Appellee then checked on her sister and determined that medical

intervention was crucial. Appellee described her sister's physical health condition on the night as

follows:

> O.K. Her legs were, she had real sores, they were running on her
> legs.  She had maggots and all, all over her legs, um, she was
> slurred speech.  She was, um, sopping wet.  She said she was very
> thirsty and all and she kept taking water and then she'd try to spit it
> out and spit it all over herself."

{¶ 7}  Appellant refused to let anyone call for medical help and, after help did arrive, she

refused to cooperate.  Due to appellant's mental confusion, the medical squad transported her to

SOMC.

{¶ 8}  Appellee further testified that appellant's physical health had improved after her

hospitalization.  Since therapy had ended, however, appellant did not walk and had stopped

taking medications (although appellee testified that appellant had taken the medications the week

prior to the hearing.)

{¶ 9}  Appellee also testified that appellant is argumentative.  Every Sunday appellant

and her husband brought back multiple bags that she hoarded in her room at Concord. [2]

Appellee opined that her sister still needed a guardianship.

{¶ 10} On cross-examination, appellee testified that she had not investigated less

restrictive alternatives for her sister's care, and in particular, home health care.  After

cross-examination, the trial court elicited testimony from appellee that indicated that appellant's

legs were still wrapped, due to old and new wounds.

{¶ 11} Appellant then testified that ten or fifteen years prior, her husband lost his job and

---

[2] The Concord nursing notes reflect the problematic hoarding.

they began to live in a trailer.   When the trailer became uninhabitable, they began to live between a car and a tent.   They also lived in several different tents because the tents rotted from sun exposure.   Eventually, appellant and her husband started to live in a van.

{¶ 12}  Appellant testified that during the weekend that led to the emergency guardianship, her shoes had started to fall off and she used rugs to deal with drainage from her leg.   She also had huge blisters on her feet, a hole in her foot, and when she stood to exit the van, she collapsed.

{¶ 13}  Appellant testified that the night the medical squad arrived, her legs had turned purplish and she believed that she had cat scratch fever.   She did not want to go to the hospital, however, because of fear that they would "cut her legs off."   She also could not keep water down, and appellant that admitted that she was "out of it" and that appellee was a "big help to her."

{¶ 14}  Appellant further testified that she had several doctors while at the hospital.   She also admitted that she refused, and continues to refuse, drugs because the side effects are worse than the treatments.    She also acknowledged she is "conscientious" about germs.

{¶ 15}  At the time of the hearing, appellant and her husband had a thirty-five year old son who lived with his grandparents. Prior to her March 2011 hospitalization, appellant had not seen a doctor since her son's birth.   At the time of the hearing, appellant was 58 years old.

{¶ 16}  The parties also stipulated to the admission of the following documents:

1. Statement of Expert Evaluation of Adenike Moore,             D.O. dated April 4, 2011;

2. Investigator's Report dated June 16, 2011;

3. Medical Records of SOMC following the March 23, 2011        admission;

4. Progress Notes from Concord Health and                        Rehabilitation Center dated August 4, 2011 through        September 11, 2011;

5. Letter from Dr. Moore dated September 1, 2011;

6. Statement of Expert Evaluation, Dr. David Provaznik,        dated September 15, 2011.

SOMC medical records reveal that several physicians initially evaluated appellant for various symptoms. Emmanuel Chukwunyere, M.D. performed a generalized initial evaluation and he found:

1. Sepsis, most likely from multiple offensive wounds        on both the lower extremities.
2. Hyperglycemia.
3. Bilateral lower extremity cellulitis.
4. Right foot abscess, confirmed by CT scan.
5. Acute renal failure.   This is most likely from        volume depletion given the patients' dehydrated        state.

6. Possible bilateral myofascitis as suggested by CT        scan of the lower extremities.   Also supported by        clinical evidence of maggots crawling out of both        feet suggestive of necrosis.

7. Anion gap metabolic acidosis, ketone negative.   This        is the most likely result of widespread muscle        necrosis.

8. Thombocytopenia, probably as a result of sepsis.

9. Undiagnosed diabetes mellitus.

10. Gangrenous left foot and fifth toe.

11. Ulcer left heel.

12. Lice infestation.

13. Possible upper gastrointestinal bleed.   This is        given the fact that returns from nasogastric        intubation were coffee ground material.

{¶ 17} Jeffrey Parker, M.D. evaluated appellant's legs and he concurred with the diagnosis of bilateral lower extremity cellulitis. Dr. Parker also assessed malnutrition. Dr. Adenike Moore, D.O., performed a psychiatric evaluation. Her notes indicate that "Patient presented confused with foul smelling parasites crawling all over her." Dr. Moore's evaluation contained her opinion that a guardianship should be established and continued. She also opined that appellant's condition will not improve. The court investigator's report also recommended the guardianship. Jennifer Roberts, D.O. also performed a gynecological exam and noted that appellant had parasitic invasion on multiple areas of her skin. Dr. Reena Samuel-Variath was also consulted regarding possible problems with Appellant's renal function.

{¶ 18} On January 31, 2012, the magistrate issued his findings and decision. Appellant timely filed objections and the trial court overruled the objections and issued its finding of incompetency. The court wrote:

> "A review of the exhibits and the testimony at the hearing establishes that Ms. Maynard is not able to make reasonable and logical connections between the effects of her previous lifestyle, her near death experience from numerous and extremely obvious medical conditions, and the need for appropriate health and personal care.
>
> Based on the reports of the medical professionals, Ms. Maynard's prognosis is that her ability to care for herself and make her own decisions will not improve. Ms. Maynard's documented physical incapacity combined with her refusals to cooperate with medical professionals' advice and her ongoing refusal to take medications clearly establish that she is incapable of making decisions that will protect her mental and physical health and safety. Ms. Maynard's objections that 'there was no finding of incompetency by clear and convincing evidence' is overruled. Likewise, Ms. Maynard's objection that the evidence was not clear and convincing that an ongoing guardianship is necessary for her protection is overruled.[3]

---

[3] In appellant's brief, appellant clarifies the Court's Finding and Entry of August 9, 2012 was a result of objections timely made to the Magistrate's Decision. Appellant points out nowhere in the Magistrate's Decision does he find by clear and convincing evidence that Appellant was incompetent. Thus, Appellant submits the first objection should have been

{¶ 19} The trial court further concluded that a guardianship is the least restrictive means to protect the ward and her property.   This appeal followed.[4]

{¶ 20} In her first assignment of error, appellant asserts that the trial court's finding of incompetency is against the manifest weight of the evidence.   In her second assignment of error, appellant asserts that the trial court's finding that a guardianship is necessary constitutes an abuse of discretion.   Because the two assignments of error involve similar and overlapping issues, we will consider them together.

{¶ 21} The first step in the guardianship process is to determine whether the applicant has shown, by clear and convincing evidence, that the prospective ward is incompetent (i.e. so mentally impaired as a result of mental illness or disability that she is incapable of taking proper care of herself or her property).   *In re Larkin,* 2009-Ohio-5014, 2009 WL 3043190, ¶ 17; R.C. 2111.02(C)(3); see, also, R.C. 2111.01(D).   The Ohio Supreme Court held:

> "Clear and convincing evidence is the measure or degree of proof
> that will produce in the mind of the trier of fact a firm belief or
> conviction as to the allegations sought to be established.   It is
> intermediate, being more than a mere preponderance, but not to the
> extent of such certainty as required beyond a reasonable doubt as in
> criminal cases.   It does not mean clear and unequivocal." *In re
> Estate of Haynes* 25 Ohio St. 3d 101, 104, 495 N.E. 2d 23 (1986).

---

sustained and the Court would have then indicted after an independent review it was modifying the Magistrate's Decision in its Entry.   Appellant cites *In re Guardianship of Rudy*, 65 Ohio St. 3d 394, 396 (1992), in which the Supreme Court of Ohio notified "that various terms such as 'incapacity' or that 'the ward had medical problems,' cannot substitute for a specific finding of 'incompetency.'" Appellant summarizes, "Regardless, ultimately, the Appellant is challenging the finding that she is incompetent."

[4] Due to inadvertence, the trial court did not include in the August 9, 2012 entry a proper notice to the parties.   See Civ. Rule 53(E)(3).   To remedy this oversight, the trial court issued a "Nunc Pro Tunc Finding and Order" on September 10, 2012.

{¶ 22} "The standard of review for weight of the evidence issues, even where the burden of proof is 'clear and convincing' retains its focus upon the existence of 'some competent, credible evidence.'" *Larkin,* supra; *In re Jordan,* 4th Dist. No. 08CA773, 2008-Ohio-4385, at ¶ 9, quoting *State v. Schiebel,* 55 Ohio St. 3d 71, 74, 564 N.E.2d 54 (1990).   Thus, even under the clear and convincing standard, appellate review is deferential.   *Larkin,* at ¶ 18.   An appellate court should not reverse a trial court's decision as being against the manifest weight of the evidence if some competent, credible evidence supports the decision.   *Id.,* citing *C.E. Morris Co. v. Foley Constr. Co,* 54 Ohio St. 2d 279, 376 N.E. 2d 578, at syllabus, see, also, *Schiebel* at 75, 564 N.E. 2d 54; *Larkin*, ¶ 18. "This standard of review is highly deferential and even 'some' evidence is sufficient to sustain the judgment and prevent a reversal."   *Eddy v. Eddy,* 4th Dist. No. 01CA20, 2002-Ohio-4345, at ¶ 27.

{¶ 23} If a court finds that a prospective ward is incompetent, the court must still determine whether to impose the guardianship, (i.e., whether it is "necessary.").   *Larkin,* supra at ¶ 19; see R.C. 2111.02(A).   Appellate courts review decisions of this nature under the abuse of discretion standard.   *Larkin* at 19; *In re Guardianship of P.D.,* 4th Dist. No. 08CA5, 2009-Ohio-3113, at ¶ 16.   Generally, an abuse of discretion connotes more than an error of law or judgment; rather, it implies that a court's attitude is unreasonable, arbitrary, or unconscionable.   *Larkin*, 19; *Masters v. Masters,* 69 Ohio St. 3d 83, 1994-Ohio-483, 630 N.E.2d 665, citing *Miller v. Miller,* 37 Ohio St. 3d 71, 73-74, 523 N.E.2d 846 (1988).   When applying this standard, a reviewing court may not merely substitute its judgment for that of the trial court. *Larkin,* supra at 19; *In re Jane Doe 1*, 57 Ohio St. 3d 135, 137-138, 566 N.E. 2d 1181 (1991),

citing *Berk v. Matthews*, 53 Ohio St. 3d 161, 559 N.E.2d 1301 (1990).

{¶ 24} Appellant argues that the trial court's finding of incompetency is against the manifest weight of the evidence.   Appellant points out that a guardianship removes her decision-making power and is a loss of personal freedom.   Appellant does not challenge her initial need for an emergency guardianship, but   argues that although her physical condition in late March 2011 greatly affected her mental status, she has since stabilized.   She also contends that no testimony of incompetency after her medical conditions had stabilized was adduced at the guardianship hearing.   She contends that the medical records, which focus on the March 2011 events, do not provide competent, credible evidence of incompetency.   She further asserts that her refusal to take medications is not evidence of incompetency, but rather the intelligent questioning of her doctors and legitimate concern about medication side effects.   In her second assignment of error, appellant asserts that the trial court abused its discretion in its finding that the guardianship is indeed necessary. Once again, because appellant's assignments of errors are interrelated, we will consider them together.

{¶ 25} In the case at bar, the trial court reviewed the court investigator's report.   The investigator spoke with appellant's husband, son, and sister.   Appellant's husband reported that her "problems" began shortly after their son's birth.   Appellant began to let their home clutter and would not allow her husband to throw things away or to allow others to clean.   Mr. Maynard stated that "[h]e just didn't know what to do because it was always an argument and he just tried to keep the peace."   Appellant also would not go to a doctor and refused any medical care.

{¶ 26} The trial court also reviewed the April 4, 2011 Adenike Moore, D.O. Statement of Expert Evaluation.   Dr. Moore diagnosed "delusional disorder, paranoid-type obsessive

compulsive disorder." Dr. Moore opined, to a reasonable degree of medical certainty, that appellant's mental capacity would not improve and that a guardianship should be established and continued. By checking boxes on the evaluation form, Dr. Moore noted impairment as to orientation, thought process, memory, concentration and comprehension, and judgment.

{¶ 27} Dr. Moore also explained that appellant is not capable of caring for her individual activities of daily living and making medical decisions. She stated: [Appellant] believes she can care for herself in a car (as she is homeless) despite having [surgical] care wounds that require a clean environment."

{¶ 28} Appellant complains that Dr. Moore's September 1, 2011 letter contains perfunctory opinion. Dr. Moore's brief letter advised a continued guardianship because "[T]his patient continues to display impaired insight and judgment." Appellant argues that her severe physical conditions at the time of her initial hospitalization significantly affected her mental state. She produced no evidence, however, to support this argument. In fact, at the hearing appellant's own testimony indicated that if no guardianship is in place, she would care for herself "same as before" and did not rule out a return to living in a car. We believe that Dr. Moore's opinion, the investigator's report, and appellant's own testimony provided to the trial court ample clear and convincing evidence of incompetence.

{¶ 29} Appellant also takes issue with the trial court's reliance on the nursing home notes from Concord (August 4, 2011 through September 11, 2011). Appellant argues that her refusal to take medication is overstated and her questioning of the doctors' orders is reasonable and intelligent. The Concord notes reflect an entry, as late as August 13, 2011, in which appellant refused medications and the following dialogue ensued:

"...I asked her if she would please take them so she could get better. She said there is nothing wrong with her. I advised her there was a reason these type meds were prescribed. She said because I was living in a car. There is nothing wrong with that there are all kinds of people that do it. I said yes, I understand that, but also advised her that it wasn't the norm. She started crying and cursed Shawnee Mental Health, cursed her whole family. I explained that they loved her and just wanted to see her get better. She did agree to take one of the Risperdals, but still refused the Depakote. Contacted guardian and advised of medication refusal, notified MD as well."

{¶ 30} Appellant also challenges the weight given Dr. David Provaznik's Statement of Expert Evaluation. She argues that no basis exists for Dr. Provaznik's comments or explanation of his credentials, and that he simply checked boxes on the evaluation form. Our review of the form, however, reveals that Dr. Provaznik certified that he evaluated appellant on September 19, 2011 and that she had been his patient for three months. Although he did "check boxes," he also added handwritten comments to indicate that appellant suffered physically from leg ulcers and mentally from delusion disorder, depression, and "obsessive compulsive." Dr. Provaznik also opined that a guardianship should be established and continued, and that appellant's conditions were not stabilized or reversible.

{¶ 31} We recognize that the standard of review in factual issues is deferential because the trial court is best able to view the witnesses and observe their demeanor, gestures, and voice inflections and to use those observations to weigh the credibility of the testimony. *Larkin, supra* at ¶ 18; *In re Jordan,* 4th Dist. No. 08CA773, 2008-Ohio-4385, at ¶ 9, citing *Seasons Coal Co. v. Cleveland,* 10 Ohio St. 3d 77, 80, 461 N.E.2d 1273 (1984) and *Jones v. Jones*, 4th Dist. No. 07CA25, 2008-Ohio-2476, at ¶ 18. Here, the trial court is in the best position to determine whether appellant's "rambling" testimony is simply that, or whether its substance is more indicative of her perceptions and impairment. Although appellant's physical condition may have

improved, her own testimony belies any improvement with regard to her mental impairments.

{¶ 32} Therefore, based on our review of the documentary and testimonial evidence in the record, we conclude that clear and convincing evidence exists to support the trial court's incompetence determination. The record is replete with evidence of appellant's mental impairment and her inability to take proper care of herself. As such, we overrule appellant's first assignment of error.

{¶ 33} In her second assignment of error, appellant contends that the trial court's finding that a guardianship is necessary constitutes an abuse of discretion. She submits that she has dramatically improved and has access to a new apartment that her husband has secured. Appellant believes that she can take care of herself in an apartment setting.

{¶ 34} As we discussed above, however, the investigator's report referenced appellant's longstanding mental health issues, which were manifested by appellant's "hoarding," uncleanliness, fear of germs, and her refusal to seek medical advice or treatment. The investigator concluded "It appears clear that Mrs. Maynard has not been responsible for her own health and well-being. Her husband has not been able to intervene in the past." The investigator's report stated that appellant's husband reported appellant's intention upon release from Concord to cease taking her medication. The investigator also emphasized that appellant's improvement correlated with the fact of the emergency guardianship and supervised care. The investigator recognized that appellant's mental and physical conditions warrant a continuing sense of structure. The investigator wrote: "Even though she appears to be and is doing well at the present time, she is doing so under 24-hour supervised care and decisions being made by others." The investigator opined: "Mrs. Maynard has demonstrated years of inability to

properly care for herself or others health, safety and wellbeing and based on her history it is most

likely she will relapse once she is released from the nursing facility if she does not maintain the

structure that has been set up for her."

{¶ 35} We also find troubling appellant's reasoning and response when questioned

regarding "if there wasn't a guardianship."   The trial court heard the following:

Q. …O.k. you were out of the, if you were allowed to          leave, if you didn't
have a guardianship, where          would you live?

A. At my apartment.

* * *

Q. Do you think you could take care of yourself if you          didn't have a
guardianship?

A. Oh yeah.

Q. How would you do that?

A. Just the same way I've always taken care of          myself.

* * *

Q. O.k. Well let me, let's focus on what I'm going to          ask you here.   If
you're in an apartment with your          husband, is that where you plan to live if
you don't          have to be in the nursing home?

A. (Response inaudible)

Q. Is that a yes?

A. If my husband and I get along.

Q. O.k. Are you going back to the car?

A. Not if I can help it in any way, shape, or form.

Based upon the history of longstanding issues and appellant's husband's inability to assist

her, and, possibly, enabling her unhealthy lifestyle choices, we readily conclude that the record contains ample evidence as to the guardianship's necessity.

{¶ 36} Finally, appellant contends that no evidence was adduced regarding whether a less restrictive alternative exists. Appellee testified that she did not check into the home health care option for her sister as "the doctor" told her he would not discharge appellant because she would not take her medications. Appellee stated that her sister had been "anti-meds…for thirty years." When asked if home care, where someone dressed her wounds and gave her the medications, would be "workable," Thomas responded:

"Because I don't think she'll stick, with it. She's o, over and over repeatedly says that she doesn't want to take meds and she's told me that she doesn't want to mess with any doctors after she got out and I didn't think that she…"

Thomas further explained:

"I don't think she's unintelligent. I don't, she always, let's put it this way, I don't think she'll ask advice of someone in authority like a doctor, to find out the angles. For example, when she quit taking her blood thinner, she didn't ask, she just decided she didn't want to do it and she just quit taking it. But then, when were at the Wound Center and I mentioned to Dr. Parker that she had quit taking that, she listened and all but she does not think to ask a doctor prior to making those decisions."

The investigator recommended that a guardianship is necessary because appellant would need home care and possible mental health counseling. Her report stated "It is questionable whether Mrs. Maynard will accept these services without a guardianship." The investigator concluded: "A guardianship will provide for the structure that has been established and monitoring and necessary steps should she begin to relapse."

{¶ 37} Based on our review of the evidence, we agree with the trial court's finding that a guardianship is necessary and that less restrictive alternatives would not sufficiently protect

appellant's interests.

{¶ 38} We recognize, however, that appellant vehemently opposes this action. Nevertheless, the evidence adduced at the hearing results in the conclusion that at the present time, a guardianship is indeed necessary.   Although this situation may improve in the future, we believe that at the present time ample evidence supports the trial court's decision.

{¶ 39} Accordingly, based upon the foregoing reasons we hereby overrule appellant's assignments of error and affirm the trial court's judgment.

JUDGMENT AFFIRMED.

### JUDGMENT ENTRY

It is ordered the judgment be affirmed and appellee to recover of appellant the costs herein taxed.

The Court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this Court directing the Scioto County Common Pleas Court, Probate Division, to carry this judgment into execution.

A certified copy of this entry shall constitute that mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

Harsha, J. & Hoover, J.: Concur in Judgment & Opinion

For the Court

BY:_____
Peter B. Abele, Judge

### NOTICE TO COUNSEL

Pursuant to Local Rule No. 14, this document constitutes a final judgment entry and the time period for further appeal commences from the date of filing with the clerk.